# EXHIBIT 1

**LOMURRO MUNSON, LLC**
Donald M. Lomurro, Esq.
NJ Attorney ID: 016801976
Eric H. Lubin, Esq.
NJ Attorney ID: 012442007
4 Paragon Way, Suite 100
Freehold, New Jersey 07728
(732) 414-0300
Attorney for Plaintiff
*Attorneys for Plaintiff Jason Nufio and*
*the Class-Plaintiffs*

| | |
|---|---|
| JASON NUFIO (STAKE.US USER WITHIN THE UNITED STATES), individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> - v - <br><br> SWEEPSTEAKS LTD. d/b/a STAKE.US, KICK STREAMING PTY LTD., AUBREY DRAKE GRAHAM p/k/a DRAKE, ADIN ROSS, LIVINGSTON ALLEN p/k/a DJ AKADEMIKS, and GEORGE NGUYEN; and JOHN DOES 1-10 (fictitious names of persons whose identities are not yet known) and ABC CORPORATIONS 1-10 (fictitious corporations or other business entities whose identities are not yet known), <br><br> Defendants. | Superior Court of New Jersey Law Division: Monmouth County Civil Part <br><br> Docket No.: <br><br> Civil Action <br><br> **CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL, DESIGNATION OF TRIAL COUNSEL** |

Plaintiff Jason Nufio ("Plaintiff"), by and through his attorneys, brings this action individually and on behalf of all others similarly situated (the "Class"), against Defendants Sweepsteaks Ltd. d/b/a Stake.us ("Stake.us"), Kick Streaming Pty Ltd. ("Kick"), Aubrey Drake Graham p/k/a Drake ("Drake"), Adin Ross ("Ross"), Livingston Allen p/k/a DJ Akademiks ("Allen"), and George Nguyen ("Nguyen"); as well as John Does 1-10 (fictitious names of persons whose identities are not yet known) and ABC Corporations 1-10 (fictitious corporations or other

1

business entities whose identities are not yet known) (Stake.us, Kick, Drake, Ross, Allen, Nguyen, John Does 1-10, and ABC Corporations 1-10 are hereinafter collectively referred to as "Defendants").  Plaintiff makes the following allegations upon information and belief (except those allegations as to the Plaintiff or his attorneys, which are based on personal knowledge).

## <u>NATURE OF THE ACTION</u>

1.     This consumer class action seeks to stop Stake.us—an illegal online gambling platform owned and run by Sweepsteaks Ltd. and Defendants from continuing to prey upon consumers, and to impose civil penalties on all Defendants to deter future misconduct.  Sweepsteaks Ltd. is promoted by Defendants Kick, Drake, Ross, Allen, and Nguyen, and it is an active collaborator in covert transmissions of money in furtherance of the ongoing music "botting" campaigns of Drake, Ross, Allen, and Nguyen.—

2.     In 2022, Ed Craven ("Craven") and Bijan Tehrani ("Tehrani") created Stake.us, a U.S. storefront for their international online casino, Stake.com.  Since then, Stake.us[1] has been operating as one of the largest and most profitable illegal online casinos since at least 2022.

3.     Craven and Tehrani created and marketed Stake.us to U.S. customers as a "social casino" that purportedly does not permit "real money gambling," to bypass applicable United States federal and State of New Jersey gambling regulations.

4.     Attempting unsuccessfully to hide behind the façade of a "safe and free gambling experience," Stake.us misrepresents itself to regulators and consumers; in reality, it operates as an illegal online casino.

5.     Stake.us offers nearly 2,000 casino games and permits players to place bets using specialized casino chips, and to cash out their winnings.

---

[1] Stake.com and Stake.us are referred to together herein, where applicable, as "Stake" or "Stake Defendants".

6. Stake.us offers two types of virtual currency: Gold Coins and Stake Cash. Gold Coins have no monetary value and cannot be converted into real money. However, Stake Cash can be redeemed for cryptocurrency or digital gift cards at a rate of 1 Stake Cash to 1 United States Dollar. Stake.us bundles every purchase of Gold Coins with Stake Cash. Thus, when a player purchases Gold Coins to engage in casino games, they are also purchasing Stake Cash. If a player is lucky and wins, they can cash out their Stake Cash for cryptocurrency. But if a player loses their Stake Cash and wishes to continue gambling, they must buy more worthless Gold Coins, which will be bundled with more Stake Cash.

7. Thus, the use of Gold Coins is a blatant proxy for the use of real money—a fig leaf to superficially avoid the appearance of illegal gambling and afford Stake a veneer of deniability. In 2025, New Jersey enacted Assembly Bill 5447, codified at N.J. Stat. § 52:17-B-139.14 *et seq.*, expressly banning precisely this type of dual-currency, online sweepstakes model. Yet despite being banned in New Jersey, Stake.us does not prevent individuals located in New Jersey from accessing and using its gambling services.

8. To promote their illegal gambling operation after it was banned from being shown on certain livestreaming platforms, Craven and Tehrani founded Kick, which operates a streaming platform of the same name backed by Stake. Kick entered into agreements with some of the country's most-watched live streamers to promote Stake to its millions of viewers.

9. Among those streamers, Stake pays Defendants Drake and Ross to promote the platform. The two have engaged in live-streamed gambling, wagering large sums of money surreptitiously provided to them by Stake. In other words, though Drake and Ross purported to be gambling with their own Stake Cash, creating the false impression that they were risking their personal funds just like ordinary users, they were in fact using house-provided funds.

3

10.     This deceptive arrangement concealed the fact that Drake and Ross faced no genuine financial risk, while ordinary consumers who followed their lead and placed similar wages stood to lose real money.

11.     Moreover, Stake has outright rigged its own games in favor of Drake and Ross, in order to increase the promotional value of Drake's use of the Stake platform and make Stake.us seem more enticing to users and potential users.  Analysis of Drake's win rate shows that he wins games created by Stake affiliates four times more frequently than the average bettor, and twice as frequently as the next-luckiest person, but wins games at the average rate on games operated by third parties.  Ross, likewise, statistically wins much more than normal on Stake-related games.[2]

12.     Through these and other promotions, Stake has bombarded consumers with advertisements appearing on social media platforms, depicting its games as safe, legal, and fun. But these casino games are illegal in New Jersey and throughout the United States, and they have inflicted harm on consumers across the State who have lost real money chasing gambling wins on the Stake platform.

13.     Defendants Drake, Ross, and, upon information and belief, Allen and Nguyen, also used Stake, including through its U.S. storefront Stake.us, to directly transfer money between and among themselves, using Stake's "Tipping" program—an unlimited and wholly unregulated money transmitter that appears to exist outside the oversight of any financial regulator.  Drake, Ross, Allen, Nguyen, John Does 1-10, and ABC Corporations 1-10 have utilized Stake's Tipping program to, *inter alia*, transfer gambling proceeds wagered on the Stake platform.

14.     Through Stake's Tipping function, Defendants have financed their combined artificial streaming ("botting") to create fraudulent streams of Drake's music; fabricate popularity;

---

[2] See https://www.bloomberg.com/features/2026-stake-drake-crypto-casino-adin-ross-gambling/.

4

disparage competitors and music label executives; distort recommendation algorithms; and distribute financing for all of the foregoing, while concealing the flow of funds.

15. At the heart of the scheme, Drake—acting directly and through willing and knowledgeable co-conspirators—has deployed automated bots and streaming farms to artificially inflate play counts of his music across major platforms, such as Spotify. These inauthentic streams were calibrated to mislead royalty and recommendation engines; manufacture popularity; distort playlists and charts; and divert both value and audience attention. In tandem, this manipulation has suppressed authentic artists and narrowed consumers' access to legitimate content by undermining the integrity of curated experiences.

16. Stake's user-to-user Tipping and encrypted internal transfer mechanisms have fueled and enabled payments to bot operators and amplifiers to be hidden from public and regulatory view.

17. Plaintiff is a Stake.us accountholder who placed bets and used Stake.us's gambling services in reliance on Drake's endorsement of Stake.us and after seeing his promotional content depicting Stake.us as a legitimate platform. Drake's celebrity status, combined with his personal participation in gambling on the platform during livestreams, led Plaintiff to believe that Stake.us was a lawful gambling experience when it in fact was not.

18. Had Plaintiff known that Defendants, including Drake, utilized the platform to "Tip" co-conspirators and employ their bot army, Plaintiff would not have signed up for an account or spent money on the platform.

19. Likewise, had Plaintiff known that Stake had been barred from operating in New Jersey, he would not have signed up for an account or spent money on the platform.

5

20. One example of a publicly documented large-value tip is a $100,000 "Tipping" transfer between Drake and Ross in 2023.

21. In December 2024, Drake gave away large sums of money in partnership with Ross and Stake as part of his "Drizzmas Giveaway."

22. These Tips, and many others like them, cycled among Drake, Ross, and, upon information and belief, Allen and Nguyen—underwriting botting and paid engagement campaigns.

23. Mere weeks before the filing of this complaint, Drake gave Ross a $220,000 car as a gift.

24. Stake.us' platform's design, which masks counterparties and camouflages withdrawals as generic transactions, stymy scrutiny and obstruct tracing of illicit transfers and proceeds.

25. "Tipping" proceeds and other transfers on and from Stake went, directly or indirectly, from Drake to, through, or with the knowledge and assistance of Ross, and on from there to, upon information and belief, Allen and Nguyen. Allen, for instance, knowingly and directly assisted Drake's inflation of his streaming numbers through bot networks by publishing and promoting information that he knew to be false while receiving payments and other benefits from, and on behalf of, Drake through Stake's tipping feature. Similarly, Nguyen served as a facilitator and operational broker, alternately converting Stake-based cryptocurrency to cash, or receiving cash from Stake-transferred cryptocurrency proceeds, and from there, interfaced with bot vendors, supervised coordinated amplification strategies, and integrated paid "clipping" campaigns.

26. "Clipping" campaigns are another example of the modern-day pyramid scheme, wherein a celebrity—such as Drake—encourages his followers to post clips from his livestreams

onto other social media platforms with an affiliate link to join the celebrity's "community." Followers who post these clips earn commissions from the celebrity endorser for each new subscriber that clicks the link and joins the community, thus incentivizing followers to extensively and repeatedly post the livestream clips and drive-up views.

27.     The "clipping" campaigns are facilitated through the clipping service and affiliated networks on various platforms including X (formerly Twitter), Discord, and—as relevant here—Kick.  Kick, in turn, is a betting platform financially underwritten by the founders of Stake.  Public posts, chat logs, leaked communications, and other records document Allen's and Nguyen's direct handling of funds through multiple payment platforms, orchestration of narrative surges, and amplification alongside—and as an instrument of—Drake and Ross.

28.     By way of example, upon information and belief, Allen engaged in, and engages in, a series of deceptive activities to support Stake's illicit scheme: Allen persistently promotes and shares Stake announcements on his social media accounts including Stake's recent AI betting agent designed to help users gamble; routinely shares Stake betting events on his social media accounts which features the Stake logo and a "Paid Promotion" notice and promotes his own betting on Stake; has streamed with Ross discussing Drake's high grossing winnings by gambling on Stake compared to other gambling apps; has posted a scene from a known video by Drake and Ross promoting the use of Stake; and has discussed his close relationship with Drake online.  These are just a few examples of the complex, deep, organized, and conspiratory nature of the illicit enterprise at issue in this case.  These, and more, will be established during discovery and at the trial of this matter.

29.     When signing up for an account on Stake.us, users are prompted to accept certain conditions, including a mandatory arbitration clause and a class action waiver.  Significantly, IP

addresses originating from jurisdictions that have banned Stake.us, including New Jersey, are not prevented from accessing Stake.us.

30.     Plaintiff and the Class are Stake.us users who have been misled by Stake.us' misrepresentations that Stake.us is a legal, harmless, and safe gaming site, when it is in fact not legal, not harmless, and not safe.   Stake.us preys on consumers in New Jersey and nationwide, who are lured into real money gambling, exposing consumers to substantial and well-documented risks of gambling addictions, and jeopardizing their and their families' financial well-being. Plaintiff and the Class were influenced to participate, and to continue to participate after their initial participation, on the Stake platform by the online promotional activities of Defendant Drake as viewed by the Plaintiff and the Class.  If not for Defendants' deceptive conduct, hiding the truth of the incestuous scheme among Defendants from users, Plaintiff and the Class would never have become users of Stake.us in the first place.

31.     Plaintiff and the Class have been further deceived into signing up for accounts on Stake.us, and spending money on Stake.us on the basis of Drake's promotion and endorsement, unaware that Defendants, including Drake, were using this platform to transfer money between themselves utilizing Stake's "Tipping" feature to send money in untraceable ways and promote botting.  Had Plaintiff and the Class been aware that Drake's endorsement was not a genuine reflection of his experience as a typical user, but rather a paid promotion masking his use of the platform as a vehicle for covert financial transfers and rigged betting, Plaintiff and the Class would not have signed up for an account or spent money on Stake.

32.     Plaintiff and the Class have also been further damaged by the false marketing manipulations and abuses of Defendant Drake, who, by his own public announcements, has been  paid  some $100,000,000 per year to promote Stake, as well as Defendants Ross, Allen, and

8

Nguyen, who have participated directly in the marketing of Stake.us, as documented in their many online posts across multiple platforms advertising and endorsing Stake. Stake has deceptively paid Drake under the table for his promotional activities by, *inter alia*, providing him with free "house money" to bet on Stake games with (though Defendants falsely hold out to the public that Drake wagers his own money), and by rigging the games played by Drake to increase his chances of winning far beyond what is probabilistically possible for any normal player. Drake's streaming fraud scheme is not only coordinated with Defendants Ross, Allen, and Nguyen, but also bankrolled through Stake with Stake's knowledge and assistance, through means like the above.

33.     Plaintiff asserts claims under the the anti-gambling provision of the Constitution of New Jersey, New Jersey's civil RICO statute, N.J.S.A. 2C:41-1 *et seq.*, the New Jersey Consumer Fraud Act ("CFA"), N.J.S.A. § 56:8-1 *et seq*, and New Jersey's law governing the recovery of illegal gambling loss, N.J.S.A. 2A:40-1 *et seq*. Plaintiff seeks damages, treble damages under RICO, restitution and disgorgement, injunctive and declaratory relief, attorneys' fees and costs, and all other relief deemed just and proper.

34.     Plaintiff's right to bring class-based RICO claims constitutes a statutory substantive right.

**<u>JURISDICTION AND VENUE</u>**

35.     Jurisdiction is proper as to defendant Allen on the grounds that Allen is domiciled in and resides in Monmouth County, New Jersey.

36.     Jurisdiction is proper as to all Defendants under the New Jersey Long Arm Statute and the Due Process Clause of the United States Constitution. Specifically, all Defendants maintain systematic and continuous contacts with New Jersey and all Defendants avail themselves of business opportunities within the State of New Jersey. Defendants have placed services into the stream of commerce of this State and directly engaged, advertised, and marketed to New Jersey

9

consumers, thus giving rise to a reasonable expectation of all Defendants that they may be hailed into the courts of this State and to answer for their RICO-related conduct under New Jersey's Long Arm Statute. All Defendants have likewise derived substantial revenue from the at-issue RICO-related conduct from New Jersey consumers. Taken together, Defendants have purposefully availed themselves of the privilege of conducting activities within New Jersey, thus invoking the benefit of its laws. This Court may exercise personal jurisdiction over Defendants because Stake.us is accessible to New Jersey residents, the website directly advertises and markets the misleading nature of the website to New Jersey residents, New Jersey residents were at the relevant time period, and are, able to sign-up and use the Stake platform, and Defendants have all derived a financial benefit from, among other things, misleading New Jersey consumers through the RICO-related and conspiratory conduct referenced herein. Because Defendants have transacted business, committed tortious acts, and caused injury in this State, and purposefully directed the conduct at issue here through interstate wires and platforms accessible and operated in this State, jurisdiction in this State is appropriate under both the New Jersey Long Arm Statute and the Due Process Clause of the United States Constitution.

37.     This Court has subject-matter jurisdiction pursuant to the New Jersey Constitution, Article VI, Section 3.

38.     Plaintiff is a resident of Roselle, New Jersey.

39.     Defendant Sweepsteaks Ltd. d/b/a Stake.us is a Cyprus Limited Company with its principal place of business located at 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

40.     Defendant Kick Streaming Pty Ltd. is an Australian Proprietary Company with its principal place of business at 2/287 Collins Street, Melbourne, Victoria, 3000 Australia.

10

41.   Defendant Aubrey Drake Graham, p/k/a "Drake," is a Canadian domiciliary.

42.   Defendant Adin Ross is a Florida domiciliary and resident.

43.   Defendant Livingston Allen, p/k/a "DJ Akademiks," is a Morganville, New Jersey domiciliary and resident.

44.   Defendant George Nguyen is an Australian national, domiciled and residing in New South Wales.

45.   Per Rule 4:3-2, venue is proper in Monmouth County because, *inter alia*, Defendant Allen resides in Monmouth County, and a substantial part of the events or omissions giving rise to the claims occurred in Monmouth County.

46.   Upon information and belief, innumerable other potential members of the Class reside in Monmouth County.

## PARTIES

47.   Plaintiff and the Class are Stake.us users within the United States, including in New Jersey, who, during the relevant period, were misled by the marketing practices of Defendants and were induced to participate in unlawful gambling on the Stake platform.  Plaintiff and the Class suffered substantial financial and economic harm as alleged herein.

48.   Defendant Sweepsteaks Ltd. d/b/a Stake.us is a Cyprus Limited Company with its principal place of business located at 28 Oktovrio, 313 Omrania BLD, Limassol, CY-3105, Cyprus.  Sweepsteaks Ltd. also operates a U.S. office at 13101 Preston Road, Suite 110-5027, Dallas, TX 75240.  Through its website and brand Stake.us, corresponding advertisements and promotions, including targeted advertisements, Stake intentionally conducts business in New Jersey.  Upon information and belief, Stake.com and Stake.us were founded by, and are owned by, Craven and Tehrani.

11

49.     Defendant Kick is an Australian Proprietary Company with its principal place of business at 2/287 Collins Street, Melbourne, Victoria, 3000 Australia.  Upon information and belief, Kick was founded by, and is owned by, Craven and Tehrani.

50.     Defendant Drake is a Canadian domiciliary. Drake is a well-known singer/songwriter whose music is available for streaming on Spotify.  In fact, Drake is purportedly the most streamed artist of all time on the platform.  In September 2025, Drake became the first artist to nominally achieve 120 billion total streams on Spotify. At all relevant times, Drake engaged in nationally promoted live streams and financial promotions connected to Stake.us that reached this State and caused harms and damages to Plaintiff and the Class in this State, among others.

51.     Defendant Ross is an online media personality and streamer who, at all relevant times, coordinated live streams and promotions on platforms accessible within this State, including streams featuring Stake.com Tipping, while maintaining close relationships with Drake, Allen, and Nguyen relevant to the conduct alleged.

52.     Defendant Allen is, upon information and belief, domiciled in New Jersey and resides in Monmouth County, New Jersey.  He, at all relevant times, used his social media accounts and nationally reaching streaming platform to promote the use of Stake and induce his followers, including New Jersey residents, to use the Stake platform.  Allen is a known amplifier and supporter of Drake and has conspired with the Defendants, and others to be identified, to create and operate the use of manufactured bot networks to fraudulently inflate Drake's music streaming numbers.  Allen has received payment and other benefits through the Stake.us and Stake.com, including the "Tipping" feature for his active participation in the botting network and active promotion of Stake.

53.      Defendant Nguyen is, upon information and belief, an Australian national residing in New South Wales who, at all times relevant, operated or co-founded entities or ventures including "Weekdays/Weekdays Capital" and "Clipping," and used online aliases including "Grand Wizard."  Nguyen coordinated botting facilitation and paid amplification across U.S.-facing platforms and, upon information and belief, transacted in payments masked through Stake.us and Stake.com, including through their "Tipping" features, in connection with the same.

## FACTUAL ALLEGATIONS

### A.      Stake's Illegal Gambling Operation

54.      Since at least 2022, Defendants have perpetrated one of the largest and most profitable illegal online gambling operations in American history.  Stake.us owns, operates, and promotes the casino.  Defendants Kick, Drake, Ross, Allen, and Nguyen, and likely others to be identified, promote the illegal casino to consumers and enable recruitment of new American players, including those in New Jersey.

### 1. The Stake.us Platform and its Services

55.      Craven and Tehrani founded the online casino Stake.com in 2017 and operated it across the world.  At the time, because the United States banned online casinos, Craven and Tehrani could not offer the Stake.com casino in the United States unless their gamblers used a virtual private network, or VPN, to access the website.

56.      In 2022, Craven and Tehrani launched Stake.us, a carbon copy of Stake.com, to bypass such restrictions.  Stake.us is almost identical to Stake.com.  Both websites offer the same or substantially similar content, including online casino games such as slots, table games, and live dealer games.  Additionally, both offer Gold Coins and Stake Cash.

57.      Just like Stake.com and other online casinos, Stake.us offers online casino games, including slots, table games, scratch cards, live dealer games, and exclusive "Stake Originals," all

of which are games of chance. The outcomes of the casino games are decided by random number generation which, as Stake.us explains, "is an algorithm that produces a random sequence of numbers which cannot be predicted."

58.   Players bet virtual casino coins on these random outcomes, and if they win, then Stake.us pays them their winnings in virtual casino coins. Players can then cash out those coins for digital gift cards or cryptocurrency (*e.g.*, Bitcoin).

59.    In this respect, at least, Stake.us does not hide the ball. Stake.us aggressively advertises the chance-based nature of its casino games to draw players in with the prospect of massive payouts.

60.   The scheme works as follows: Stake offers users two types of virtual currency: Gold Coins and Stake Cash. Gold Coins do not have monetary value and are described by Stake as solely for entertainment purposes. Stake Cash, on the other hand, can be cashed out at a one-to-one exchange rate for US dollars and thus serves as the currency with which most bets are made.

61.   Users can buy Gold Coins or earn them through various promotions, and Stake characterizes Gold Coins as the primary currency for casual gameplay. With each purchase of Gold Coins, however, Stake bundles a set quantity of Stake Cash, which has actual monetary value and is the true currency with which Stake users place bets. Indeed, for every dollar spent on purchasing Gold Coins, Stake bundles a nearly equivalent amount of Stake Cash. For example, a user can purchase 200,000 Gold Coins and $20.05 in Stake Cash for $20 USD.

62.   The Stake.us platform allows users to play casino games, such as roulette and virtual slot machines, which are pure games of chance. The outcome of these games is determined by random number generators—at least when ordinary users, as opposed to Stake affiliates like Drake or Ross, are playing. Users may bet Stake Cash on these online casino games with the

14

prospect of a large payout, often many multiples of what was bet.  Stake's virtual casino games involve no skill or strategy.

63.     Stake.us also features live dealer games, which allow users to "interact with human dealers" and experience "what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device."[3]  Stake's live dealer games are filmed in a studio and players may bet on the results—for example, of the spin of a roulette wheel or the next Blackjack card.  Stake's live dealer games, like their counterpart in a brick and mortar casino, are games of chance.

64.     Stake.us conducts an illegal gambling business within the meaning of N.J. Stat. § 52:17B-139.14 *et seq*., including by operating casino-type wagering in violation of multiple state laws, involving five or more persons, and in substantially continuous operation with substantial daily revenue.

65.     Publicly filed civil enforcement and consumer actions across multiple states accuse Stake.us of unlawful gambling operations.[4]

66.     Stake.us's dual-currency system, using Gold Coins as a proxy for Stake Cash, also constitutes a sweepstakes within the meaning of N.J. Stat. § 52:17B-139.14 *et seq*., a statutory scheme which forbids offering or conducting a sweepstakes in which "a person present in New Jersey may participate[,]" subject only to narrow exceptions which Stake.us does not satisfy.  This scheme, as passed in Assembly Bill 5447 in 2025, has the express intent and effect of banning Stake.us from operating in New Jersey and/or offering its services to New Jerseyans.

---

[3] https://stake.us/blog/how-to-play-live-dealer-games.

[4] *See, e.g.*, *Wolters v. Sweepsteaks Ltd.*, No. 25-cv-3280 (D. Minn Aug. 15, 2025); *Dixon v. Sweepsteaks Ltd.*, No. 25-cv-9641 (D.S.C. Aug. 4, 2025); *Deleon v. Sweepsteaks Ltd.*, No. 25-cv-1481 (D. Mass. May 23, 2025); *Hall v. Sweepsteaks Ltd.*, No. 25-cv-00345 (D. Ala. May 2, 2025); *Urdan v. Sweepsteaks Ltd.*, No. 2-cv-03736 (N.D. Ill. Apr. 7, 2025); *Boyle v. Sweepsteaks Ltd.*, No. 25-cv-00302 (C.D. Cal. Feb. 14, 2025); *Ridley v. Sweepsteaks Ltd.*, No. 25-cv-02511 (E.D. Va. Dec. 31, 2025).

67. By providing a freely accessible online gambling forum accessible to consumers in the State, Stake is flagrantly violating New Jersey law and jeopardizing the health and safety of New Jersey residents.

*2. Stake.us' Misrepresentations Regarding the Legality of Its Operation*

68. Despite offering online casino games, Stake.us holds itself out in its Terms and Conditions as a platform that does "not offer real money gambling" and claims that "no purchase or payment is necessary to participate or play [Stake.us] games."

69. The Stake.us homepage claims it provides "the ultimate social, safe and free gaming experience."

70. These representations are misleading as players are encouraged to wager Gold Coins or Stake Cash, or some combination of both, on the casino games, confusing consumers into believing they are participating in harmless and free gaming, when in fact, they are participating in gambling with valuable currency.

71. Stake characterizes itself as a "Social Casino," which is intended to misrepresent the legality of the platform's operations. According to Stake: "A Social Casino refers to an online platform that offers casino-style games for entertainment purposes, without involving real money. Instead, we use tokens (Gold Coins and Stake Cash). Users can enjoy a variety of casino games, such as slots, roulette and blackjack, but with the use of virtual currency—tokens—rather than real money."

72. This is demonstrably false. Stake.us offers traditional casino games to its users, providing the option to place bets and cash in winnings. Stake.us users can receive Gold Coins or Stake Cash, or a combination of the two, to continue wagering bets on Stake.us' website. Stake Cash is purchased using cryptocurrency and its value is pegged to the U.S. dollar. If a user wins their bet, they can cash out Stake Cash for real money.

16

73.     Stake.us further confuses consumers by purporting to exclude those who live in New Jersey from access to its services, by language requiring users creating new accounts to warrant that they do not live in New Jersey—language which one must scroll through its Terms and Conditions to see.  However, this fails to abide by the scope of N.J. Stat. § 52:17B-139.14 *et seq.*, which prohibits offering sweepstakes within New Jersey (whether or not to individuals who *reside* in the state).  Further, Stake.us does not actually bar IP addresses from within New Jersey from accessing its website.  By use of this language in its Terms and Conditions, Stake.us improperly seeks to shift the onus of compliance with New Jersey anti-gambling law from itself to unwitting users.

### 3.   *Kick, Drake, Ross, Allen, and Nguyen's Fraudulent Promotion of Stake.us*

74.     Stake.us has created one of the largest illegal gambling enterprises in history. It did so in part by recruiting accomplices and conspirators to promote Stake.us to massive fan bases.

75.     One such accomplice and conspirator knowingly and intentionally drove Stake.us to success by promoting the casino to Plaintiff: Kick Streaming.  Kick has created and curated an online platform designed to promote gambling at Stake's casinos.  Kick recruited individuals to livestream their gambling on Stake.us, to create advertisements for Stake.us, and to leverage their fame to entice Plaintiff and others in New Jersey and across the United States to gamble and lose money at the Stake.us casino.

76.     Tehrani and Craven founded Kick Streaming in 2022—the same year as Stake.us— after Twitch, another major streaming provider, banned the streaming of Stake.com.

77.     There was no ambiguity about Kick's purpose: Kick was created to facilitate the streaming of illegal gambling.  In 2023, Craven reportedly acknowledged that Kick was losing money, but highlighted Kick's marketing value for Stake and the overlap in the shareholders between the two companies.

78.     Kick targeted unlawful content by directly calling upon users to post content and prompting the type of content to be submitted.  Kick entered into eight-figure contracts regarding streaming content, including with Defendants Drake and Ross.

79.     For example, in 2023, Drake reportedly signed a $100,000,000 per year endorsement deal with Stake for him to promote Stake within the United States.

80.     Similarly, in 2023, Kick reportedly entered an exclusive contract with Defendant Ross. Ross later stated that he was paid a guaranteed rate for livestreaming on Kick that exceeded $10,000 per hour.

81.     Ross is one of the most high-profile Stake.us streamers, with 6.3 million followers on Instagram and 1.9 million followers on Kick.

82.     Ross and Drake livestreamed their gambling at Stake.us for hours at a time, garnering hundreds of thousands of viewers.

83.     For example, on or around November 25, 2021, Ross livestreamed himself on Kick betting $100,000 on a Stake Blackjack game.

84.     On or around April 14, 2025, Drake and Ross hosted a joint livestream where they gambled on Stake together.

85.     Drake and Ross have livestreamed their gambling on Stake.us to massive audiences, participated in advertisements for Stake.us, and leveraged their fame to entice Plaintiff to gamble and lose money at the Stake.us casino.

86.     Livestreaming gambling on Kick by Drake, Ross, and others is particularly dangerous because their audiences are primarily young individuals.  For example, Ross has claimed that most of his followers are teenagers or in their early 20s.  This demographic is especially at risk for developing gambling addiction.

18

87.     Defendants Drake and Ross have been zealous promoters of Stake and have knowingly and intentionally driven Stake.us to success by promoting the casino to Plaintiff and the Class.

88.     Drake has bet large sums on Stake and livestreamed the event, further promoting Stake to his millions of followers.  Stake.us publicly stated that Drake "has been a long-time member of the Stake community," and ultimately a "partnership was formed" in which "a new gaming experience" will allow users to "have a chance to win big alongside Drake.  This type of giveaway will be on a magnitude unseen before."[5]

89.     Drake's "Journey from a Player to a Partner" is documented on Stake's web properties, while Drake's social media accounts identify his partnership with Stake.

90.     During livestreamed events, Drake and Ross have made large bets on Stake using house money provided by Stake.  This misleading conduct simply encourages and influences the large fan base of Drake and Ross to make similarly large and/or unwise bets—yet using Stake Cash they purchased themselves.

91.     Stake has also directly rigged games played by Drake and Ross to increase promotional value.  Analytics show that Ross, and especially Drake, win at higher rates than can be explained by chance.  On games run by Stake affiliates, Drake's wins are approximately four times more frequent than the average player, and twice as frequent as the next 'luckiest' player after him—but on games run by third parties, his win rates are average.  It is clear as day that Stake is rigging games in which Drake plays, which serves both as another way to compensate Drake for

---

[5]     https://www.gamblingcommission.gov.uk/public-and-players/guide/return-to-player-how-much-gambling-machines-payout.

19

his endorsements and a way to entice Drake's many millions of impressionable fans—including Plaintiff—to use and lose money on Stake.

> *4.   Stake's Terms and Conditions Require Users to Waive Certain Rights*

92.   Section 26 of Stake.us' Terms and Conditions imposes on all users, including Plaintiff and the Class, a contract of adhesion mandating that all disputes be referred to arbitration and that users waive their right to sue in open court.

93.   The Terms and Conditions impose other requirements, such as purporting to waive any right to challenge the American Arbitration Association's competence, authority, or jurisdiction to hear the matter; requiring that the arbitration be held virtually; limiting depositions to one per party unless Stake consents to more; waiving a hearing if neither party's claims exceed $25,000; and mandating strict confidentiality.

94.   Stake.us' Terms and Conditions require users to waive the right to any form of collective, consolidated, or class action.

95.   Such Terms and Conditions are contrary to public policy and were procured through Stake.us' deception of Plaintiff (and the Class) into creating an account based on representations that the site offered a safe, free, and legitimate gambling experience, and based on Drake's endorsement and advertisement of the platform.

> *5.   Consumer Harms from the Illegal Gambling Operation*

96.   Stake.us generates revenue from unwitting, and often vulnerable, American consumers—incentivizing Stake.us to continually deceive American consumers and regulators.

97.   Such misrepresentations that Stake.us is not a casino, when in fact it functions as one, prey on consumers, particularly those who are prone to gambling addiction.

98.   By masking its real money gambling platform as a free and safe "social casino," all Defendants created a predatorial gambling environment, deliberately misleading consumers and

20

exposing consumers to the risks of gambling addiction and jeopardizing the financial well-being of consumers and their families.

99.    Plaintiff is a Stake.us accountholder who placed bets and used Stake.us's gambling services in reliance on Drake's endorsement of Stake.us and after seeing his promotional content depicting Stake.us as a legitimate platform. Drake's celebrity status, combined with his personal participation in gambling on the platform during livestreams, led Plaintiff to believe that Stake.us was a lawful gambling experience when it was not.

100.    Plaintiff has been damaged by the misrepresentations inherent in Drake's endorsement and advertisement of Stake.

101.    Drake's promotional activities portrayed him as an ordinary user of the platform when, in reality, he uses the platform and its proceeds to tip his co-conspirators and deploy his bot army in furtherance of fraudulent streaming schemes.

102.    Had Plaintiff known that Defendants, including Drake, utilized the platform to "Tip" co-conspirators and employ their bot army—including for the streaming fraud discussed *infra*—Plaintiff would not have signed up for an account or spent money on the platform.

103.    Plaintiff has been damaged by the false marketing manipulation and abuses of Defendants Drake, Ross, Allen, and Nguyen, who participate in the marketing of Stake.

104.    Defendants Drake, Ross, Allen, and Nguyen's scheme has caused damage to Plaintiff, who was manipulated into signing onto and transacting on Stake.us based upon Defendants Drake, Ross, Allen, and Nguyen's misrepresentations.

**B.    Drake's Illegal "Botting" Scheme and Its Connection to the Illegal Gambling Operation.**

105.    Drake, Ross, Allen, and Nguyen have further incentive to promote (and mask the true nature and extent of their conduct on and around) Stake.  Since at least 2022, Drake and

21

those acting under his direction—including Ross, Allen, and Nguyen—have made use of Stake.com and Stake.us to covertly finance the orchestrated procurement of botting and streaming farm activities to artificially inflate the number of plays attributed to Drake's catalogue across major digital streaming services such as Spotify.

### 1. The Music Streaming Industry

106.   Individuals can stream music through music streaming platforms such as Amazon Music, Apple Music, Spotify, and YouTube Music (the "Streaming Platforms").  Each time a song is streamed through one of the Streaming Platforms, the songwriter who composed the song, the musician who performed it, and in certain cases other rights holders, are entitled to small royalty payments.  The exact amount of the royalty payments owed varies depending on several factors, but it is often less than one cent per stream.

107.   The funds used to pay royalties to songwriters, composers, lyricists, and music publishers (the "Songwriters") are obtained from the Streaming Platforms.  Generally, the Streaming Platforms are required to pay a certain percentage of their revenues (the "Revenue Pool") to Performance Rights Organizations ("PROs"), for the right to publicly perform songs (known as performance royalties), and to the Mechanical Licensing Collective (the "MLC"),[6] for the right to digitally reproduce and distribute songs (known as digital mechanical royalties).  The Streaming Platforms also send data on streaming activity along with the Revenue Pool, which is then used by the PROs and the MLC (collectively, the "Rights Organizations") to proportionally allocate and disperse payments from the Revenue Pool to the Songwriters whose songs were streamed during the same period that the Streaming Platforms earned the revenue.  As a result,

---

[6] The MLC is a nonprofit organization designated by the U.S. Copyright Office pursuant to the Music Modernization Act of 2018, Pub. L. No. 115-264, 132 Stat. 3676 (2018). The MLC collects digital mechanical royalties from the Streaming Platforms and distributes them to the Songwriters.

streaming fraud diverts funds from Songwriters whose songs were legitimately streamed by real consumers to those who use automation to falsely create the appearance of legitimate streaming.

108.   The funds used to pay royalties to performing artists, record companies, or other sound recording distributors ("Artists") are also obtained from the Streaming Platforms.  Like songwriter royalties, Streaming Platforms are generally required to pay a pool of royalties to Artists for the right to stream the sound recordings that embody musical compositions.  This sound recording royalty pool is also often calculated as a certain percentage of Streaming Platform revenues, and the royalty pool is then allocated proportionally among Artists based on their respective percentages of total streams.  These allocated royalty funds are then paid directly by Streaming Platforms to Artists (through the record companies and music distribution companies).  Streaming fraud diverts sound recording royalties away from Artists whose sound recordings were legitimately streamed by real consumers, in the same way that streaming fraud diverts musical composition royalties away from Songwriters.

### 2. Streaming Fraud is Prohibited by the Streaming Platforms, Music Distribution Companies, and Rights Organizations

109.   Streaming Platforms generally prohibit streaming manipulation in their terms of service.  Like music distribution companies, which facilitate the distribution of artists' music to the Streaming Platforms, also prohibit streaming fraud.  The Rights Organizations generally prohibit streaming manipulation.  Indeed, the mission of the MLC is to ensure that Songwriters receive their mechanical royalties from streaming and download services accurately.[7]

110.   Such activity constitutes "streaming fraud," whereby music streams are artificially and fraudulently increased to increase the revenue share for the Rights holders of those artists,

---

[7] The federal regulations that govern the MLC's distribution of digital mechanical royalties provide that manipulated streams are not eligible for royalties. *See* 37 C.F.R. §§ 385.2, 385.21.

thereby capturing ill-gotten music royalties that would otherwise be owed to other Rights holders whose own revenue shares have been diminished by the fraud.

111.    Oftentimes, streaming fraud is carried out by deploying "Bots," which are automated software programs that run scripts to perform repetitive tasks on the internet at high speeds.  In the context of streaming fraud, large numbers of Bots are programmed to repeatedly and continuously stream certain songs, thereby fraudulently inflating the total number of streams for that music.  These Bots are often purchased, deployed, or coordinated by third parties for the purpose of manipulating streaming metrics.  The use of such Bots creates the false appearance of heightened popularity for specific artists or recordings and inflates the total number of reported streams on the platform.

112.    Oftentimes, those engaged in streaming fraud employ "Bot Vendors," who are specialized tech and software companies that build and deploy Bots on the internet.

113.    Bot Vendors typically design Bots to mimic human behavior and resemble real social media or streaming accounts in order to avoid detection ("Bot Accounts").  Bot Vendors also use Virtual Private Networks ("VPNs"), which are encrypted internet connections that protect privacy and data, in part, by obscuring the physical location of the internet user.  Through a series of technical devices, Bot Vendors use VPNs to obscure the true location of the Bot Accounts, making it appear as though the Bots are streaming music from all over the world, when in reality the Bot Accounts all originate from a small number of locations (in some cases a singular location), and from areas that lack the population to support a high volume of streams.

114.    There is no limit to the number of Bots that can be deployed, particularly on Spotify whose platform does not require a credit card to establish an account.  Bot Vendors can utilize thousands, and in some cases, many more Bots at any one time.

24

115.    The use of Bots is ostensibly prohibited on all major music platforms, including Spotify, as they can result in a distortion of those services' finite revenue pools, and in so doing, distort the revenue shares owed to Artists and Rights holders whose music is being streamed by legitimate users.

### 3.  Defendants' Music Streaming Manipulation Scheme

116.    Defendants' music streaming fraud proceeded in three stages.   First, upon information and belief, Drake and Ross used their illegal gambling proceeds to pay Allen, Nguyen, and Bot Vendors to create thousands of Bot Accounts on the Streaming Platforms that they could use to stream songs.  Second, Allen, Nguyen, and others used software to cause the Bot Accounts to continuously stream Drake's songs.  Third, Drake collected royalties based on the fraudulent streams by the Bot Accounts.

**Phase 1: Drake and Ross Funnel Their Illegal Gambling Proceeds to Allen, Nguyen, and Others through Stake's Anonymous Tipping Feature**

117.    Drake and Ross knew that Streaming Platforms would shut down any Bot Accounts if they learned that they were fraudulently streaming Drake's music.  Drake and Ross, therefore, took steps to conceal their scheme and to evade the Streaming Platforms' fraud detection and prevention systems.

118.    Upon information and belief, Drake and Ross exchanged millions of dollars between themselves and others through various means including unregulated "tips" on Stake.com and the exchange of high-value gifts.

119.    Stake.com offers a user-to-user "Tipping" program—an unlimited and wholly unregulated money transmitter that appears to exist outside the oversight of any financial regulator.

120. The Tipping feature and internal transfer mechanisms effectively obscure the identities of counterparties, mask withdrawals as generic transactions, and stymie scrutiny and tracing of illicit proceeds.

121. Through the Tipping mechanism, withdrawals are recorded merely as Stake transactions, concealing their true origins and recipients. These transactional features enable the concealment, covert routing, and disbursement of funds to bot operators, intermediaries, and amplifiers integral to sustaining and expanding the artificial streaming and amplification operations.

122. Upon information and belief, Drake, Ross, Allen, and Nguyen used VPNs to access Stake.com, which in turn gave them access to Stake.com's Tipping program.

123. Drake and Ross used the Tipping feature to send each other high dollar amount (above U.S. Currency Transaction Report thresholds) "Tips" during live streams.

124. On or around November 10, 2023, for example, Ross livestreamed himself on Kick "Tipping" $100,000 to Drake through Stake, telling him to use the money for gambling.[8]

125. On or around October 8, 2024, Ross again livestreamed himself on Kick "Tipping" $11,000 to Drake through Stake.

126. Drake and Ross' high-value exchanges were not limited to Stake, however.

127. In or around May 2025, Ross gifted Drake a diamond encrusted Nokia cell phone chain estimated to be valued at over $300,000.

128. In or around November 2025, Drake gifted Ross a $220,000 car.

---

[8] https://www.essentiallysports.com/esports-news-adin-ross-tips-drake-with-hundred-grand-after-winning-millions-while-gambling/

26

129.    Upon information and belief, these "gifts" were publicized events sponsored by Stake to be streamed on Kick to further promote viewership of their channels where Drake and Ross promoted Stake's illegal gambling business.

**Phase 2: Allen and Nguyen Orchestrate Clipping Campaigns**

130.    Upon information and belief, Drake and Ross sent intermediary transfers to Bot Vendors and logistics facilitators, including Allen and Nguyen—known recipients of payments linked to clipping and amplification campaigns.

131.    Allen persistently promotes Stake, and shares Stake video content, to his millions of followers across his various popular social media accounts on X, TikTok, Instagram, Twitch, and YouTube.

132.    For example, on March 31, 2026, Allen posted a "paid promotion" of Stake's recent AI betting agent designed to help users gamble.[9]

---

[9] https://x.com/Akademiks/status/2039147531620225093.

27



133.   Allen similarly has posted "paid promotions" and "paid partnership" messages on his social media accounts of sporting events on which users can place bets through Stake's platform.

134.   On April 10, 2026, Allen posted on X "Lemme get that" and shared an image promoting Stake's betting opportunities and a special promotion for escalated prize-winnings for an upcoming UFC fight between Jini Prochazka and Carlos Ulberg.[10]

---

[10]   https://x.com/Akademiks/status/204278562960092476.



135.   On April 13, 2026, Allen posted on X "Yankees better secure," sharing Stake's odds and estimated payouts for the New York Yankees vs. Los Angeles Dodgers baseball game happening that evening.[11]

---

[11] https://x.com/Akademiks/status/204383284659818923.

29



136.    On April 18, 2026, Allen posted "Lake show," and shared the Stake odds and estimate payout for the Los Angeles Lakers vs. Houston Rockets basketball game happening that evening.[12]

_____

[12] https://x.com/Akademiks/status/204559915177838593.



137.  The foregoing are merely a few examples of the many posts in which Allen has promoted Stake to his social media followers.[13]

138.  In further promotion of Stake, Allen has streamed with Ross discussing Drake's high grossing winnings by gambling on Stake compared to other gambling apps, boasting that "Drake makes over 100M from Stake!"[14]

---

[13] *See, e.g.*, https://x.com/Akademiks/status/1995619637036450226;
https://x.com/Akademiks/status/2044038023365427441/photo/1;
https://x.com/Akademiks/status/1995231564331196510; https://x.com/Akademiks/status/1994783972497178640;
https://x.com/Akademiks/status/1994084337386492115.
[14] https://www.youtube.com/watch?v=tQBHgBbyIFI.

139. Upon information and belief, Allen has a close relationship with Drake and amplifies and promotes him to his millions of followers on his social media accounts, including posting a video in support of Drake, and discussing Drake's assistance with paying for the recovery of purportedly hacked social media account of someone associated with Allen.[15] These pro-Drake videos and posts are then amplified by bot networks.

140. As part of a clipping campaign, Allen has amplified and posted clips to his social media accounts of scenes from Drake's and Ross's Stake promotional video—thus further driving traffic to Stake and to Drake's and Ross' content, in particular.[16]



---

[15] https://x.com/WhoopingFeet/status/1912681366040531021.
[16] https://x.com/Akademiks/status/1911633879124807770/video/1.

32

141.    Allen, in turn, has received monetary and other compensation from Stake, Drake and Ross, among others, for his role in promoting their content and driving views and clicks toward their sites and accounts.

142.    Similarly, Nguyen, known in online forums as "Grand Wizard," "Grand Wizard Chat N***a," or "Grand Wizard CN," functioned, and appears to continue to function, as a broker and operational facilitator for "botting" schemes used to perpetuate and scale streaming manipulation activities.

143.    Upon information and belief, Nguyen is a video content "Clipper" who edits internet content creators.  Ross has publicly stated that he is "friends" with Nguyen, who in turn has claimed to edit Ross' videos.

144.    Upon information and belief, Nguyen is also acquainted with Drake.  Leaked messages from Nguyen's Instagram account reflect that he and Drake frequently communicated with each other.

145.    Nguyen is part of a "Clipping" community on the social media platform Discord that connects content creators with content editors who are compensated for cutting, editing, posting, and tracking viral video clips across social media.  Compensation for Clippers is typically based on performance, with payment tied to engagement metrics, such as new subscribers to a community, pay-per-click, and number of view counts generated through dedicated affiliate links.

146.    Nguyen's Discord Clipping community orchestrated "clipping" campaigns intrinsically tied to streaming numbers and influencer content, including campaigns involving Drake and Ross.

147.    Nguyen actively promoted and participated in these campaigns, receiving direct payments both from the Discord's administrators and other co-conspirators.

33

148.  Nguyen paid Bot Accounts to artificially inflate views on his Clipping campaigns.

**Phase 3: Bots Inflate Drake's Streaming**

149.  A substantial percentage of Drake's Spotify streams between January 2022 and September 2025 were inauthentic and appear to be the work of a sprawling network of Bot Accounts.

150.  Drake's music streams reflect abnormal VPN usage, seemingly designed to obscure the true geographic origins of Bot Accounts that were streaming his songs.  For example, Plaintiff is informed and believes that over a four-day period in 2024, at least 250,000 streams of Drake's song "No Face" originated in Turkey, but were falsely geomapped through the coordinated use of VPNs to the United Kingdom in attempt to obscure their origins.

151.  A large percentage of the accounts streaming Drake's music were geographically concentrated around areas whose populations could not support the volume of streams emanating therefrom.  In some cases, massive amounts of music streams—more than a hundred million streams—originated in areas with zero residential addresses.

152.  Geohash data shows that nearly 10% of Drake's streams come from users whose location data showed that they traveled a minimum of 15,000 kilometers in a month, and moved unreasonable locations between songs (consecutive plays separated by mere seconds but spanning thousands of kilometers), including more than 500 kilometers between songs (roughly the distance from New York City to Pittsburgh).

153.  Between January 2022 and September 2025, the volume and timing of the music streams for Drake's music failed to follow typical, established streaming patterns.  While most songs and/or albums see an initial spike in streaming immediately upon release, those same songs/albums typically follow a predictable decay pattern over the following months.  However, in many instances, the streams of Drake's music on Spotify saw significant and irregular uptick

34

months—and in some cases years—after the release of his songs, with no reasonable explanations for those upticks other than streaming fraud.  In other instances, Drake's decay rate was slower and less dramatic when compared to those of his contemporaries.

154.    Additionally, the number of streams of Drake's music attributable to individual accounts is staggering and irregular.  For instance, while the average Spotify listener listens to 10 songs per day, a massive and disproportionate amount of the accounts listening to Drake's music (Drake's "Listeners") listened exclusively to Drake's music for 23 hours a day.

155.    Less than 1% of Drake's listeners account for roughly 9% of his streams; less than 2% account for roughly 15% of his streams.  Consequently, Drake's music accumulated far higher total streams compared to other highly-streamed artists, even though those artists had far more "users" than Drake.

156.    As a result of the fraudulent streaming scheme described above, with respect to Drake's music, the Rights holders of Drake's music (Drake and his company Frozen Moments, LLC) saw their shares of the revenue pool substantially and artificially increased.  This generated significant revenues for Drake and Frozen Moments, LLC, all at the expense of other Rights holders whose shares and revenues were greatly diminished.

157.    The amount of streaming revenue that would otherwise have been distributed to legitimate Rights holders but for the fraudulent boosting of Drake's music is estimated to be in the hundreds of millions of dollars.

158.    Stake facilitated and contributed to this scheme by, *inter alia*, outright compensating Drake and Ross through rigging Stake games and giving them "house money" to play with at no risk of loss, and allowing its dual-currency and "Tipping" system to be used as a

vehicle for Drake and Ross to covertly move the funds necessary for the fraudulent streaming scheme.

<strong><u>CLASS ACTION ALLEGATIONS</u></strong>

159.    Plaintiff brings this action individually and on behalf of a class of similarly situated individuals pursuant to Rule 4:32-1.

160.    Plaintiff seeks to represent the following classes or persons: All persons in the United States who created an account on or accessed Stake.us and who purchased Gold Coins bundled with Stake Cash and made and lost one or more wagers using Stake Cash within the last three years.

161.    In the alternative, Plaintiff seeks to represent the following classes or persons: All persons in New Jersey who created an account on or accessed Stake.us and who purchased Gold Coins bundled with Stake Cash and made and lost one or more wagers using Stake Cash within the last three years.

162.    Excluded from the Class are Defendants, their officers, directors, and affiliates, and any judicial officer assigned to this matter and their immediate families.

163.    Plaintiff reserves the right to further amend or modify the Class definition in connection with his motion for class certification, as a result of discovery, at trial, or as otherwise allowed by law.

164.    Plaintiff brings this action individually and on behalf of all others similarly situated because there is a well-defined community of interest in the litigation and the proposed Class is easily ascertainable.

**A.    Numerosity**

165.    The potential members of the Class, and each of the sub-classes independently, are so numerous that joinder of all the members is impracticable. While the precise number of

36

members of the Class, or each of the sub-classes, has not been determined, Plaintiff is informed and believes the Class, and each of the sub-classes, includes at least thousands of individuals.

166.    Based on information and belief, Stake.us online records, and other data, books, or records, will evidence the number and identity of Class members.

**B.    Commonality and Predominance**

167.    There are questions of law and fact common to the Class that predominate over any questions affecting only individual Class members.  These common questions of law and fact include, without limitation:

(a) Whether Defendants engaged in unfair or deceptive business practices by making the misrepresentations and omissions as described herein;

(b) Whether Stake.us constitutes an illegal gambling platform in violation of United States and New Jersey law;

(c) Whether Defendants' conduct constitutes predicate acts of monetary transactions in criminally derived property, or other racketeering activity under RICO and the relevant statutory schemes;

(d) Whether Defendants were unjustly enriched by proceeds routed through the coordinated scheme;

(e) Whether liability and damages can be established with common proof through platform data, financial tracing, and expert analysis; and

(f) Whether injunctive, declaratory, or other class wide relief is necessary and appropriate to prevent recurrence of the described conduct.

37

### C.      Typicality

168.     Plaintiff's claims are typical of the claims of the Class.  Plaintiff and all members of the Class sustained injuries and damages arising out of, and caused by, the same common course of conduct in violation of law.

### D.      Adequacy of Representation

169.     Plaintiff will fairly and adequately represent and protect the interests of the Class. Counsel who represents Plaintiff are competent and experienced in litigating large consumer class actions.

### E.      Superiority of Class Action

170.     A class action is superior to other available means for the fair and efficient adjudication of this controversy.  Individual joinder of Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members.  Each member of the Class has been damaged and is entitled to recovery because of Defendants' unlawful actions and/or practices described herein.   There are no individualized factual or legal issues for the Court to resolve that would prevent this case  from proceeding as a class action.  Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system.  Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## COUNT I

**Violation of N.J.S.A. 2C:41-1 *et seq*.,**
**Participation in an Unlawful Enterprise Through a Pattern of Racketeering Activity**
**(Against All Defendants)**

171.     Plaintiff realleges the preceding Paragraphs as if alleged herein.

38

172. Plaintiff's right to bring class-based state RICO claims constitutes a statutory and unwaivable remedy.

173. Defendants are all persons within the meaning N.J.S.A. 2C:41-1(b).

174. The Enterprise: Defendants, together with Bot Vendors, streaming-farm operators, and other facilitators known and unknown, associated to form an association-in-fact enterprise (the "Enterprise") within the meaning of N.J.S.A. 2C:41-1(c).

175. Common Purpose: The Enterprise's common purpose was to enrich the Defendants at Plaintiff's expense through an illegal online gambling and streaming manipulation operation. Defendants promoted the illegal gambling operation and used proceeds from the operation to pay for services that artificially inflated streaming counts for Drake's catalog. Drake, in turn, leveraged his elevated status generated from such artificial streams to further promote the illegal gambling operation.

176. Continuity: The Enterprise has operated as a continuous, coordinated unit since at least 2022 and remains an ongoing and imminent threat of racketeering activity. The Enterprise is defined by explicit roles:

    a. Stake.us is an illegal online casino founded by Craven and Tehrani in 2022, earning profit by selling consumers Gold Coins and Stake Cash;

    b. Stake.com served as a transactional infrastructure for routing, concealing, and distributing funds via Tipping;

    c. Kick is a streaming platform founded by Craven and Tehrani in 2022 to promote Stake's illegal gambling business;

d. Drake has been a paid promoter and spokesperson for Stake since 2022, and financed, directed, and reaped the benefits of streaming and social media manipulation;

e. Ross has also been a paid promoter for Stake since 2022, and amplified Stake.us as a casino and covert payment conduit;

f. Upon information and belief, Allen, Nguyen, John Does 1-10, and ABC Corporations 1-10 have been paid promoters for Stake since 2022, and received money through Stake to broker, coordinate, and operate through Bot Vendors and Clipping channels to artificially boost Drake's streams.

177.   <u>Relationships & Participation in Management/Operation of Enterprise</u>: Each Defendant held a related role in the management operation of the Enterprise that funneled illegal gambling proceeds to illegal bots that artificially boosted Drake's streams and deceived streaming platforms:

a. Stake at all times served as a gambling platform and money transfer conduit through which payments could be concealed. Stake further paid influential individuals, including Drake and Ross, to promote Stake.us as legal and safe;

b. Kick partnered with high-profile streamers like Drake and Ross to promote Stake through their livestreams on Kick;

c. Drake promoted Stake on Kick and made and received payments through Stake, and directed and benefited from artificial streaming and narrative amplification;

d. Ross promoted Stake on Kick and financed, promoted, and facilitated the routing of value—including via public and private "Tipping" and large-value transfers on Stake—while coordinating amplification with Allen and Nguyen; and

40

e. Upon information and belief, Allen, Nguyen, and others presently unknown further promoted Stake, sent and received payments through its Tipping system, and brokered and interfaced with Bot Vendors and paid amplification pipelines (including through Weekdays/Weekdays Capital and the Clipping service).

178. <u>Effect on Interstate Commerce</u>:  The Enterprise engaged in and affected interstate and foreign commerce through the use of nationally accessible platforms, interstate wires, and cross-border payment and settlement networks.

179. <u>Pattern of Racketeering:</u> In furtherance of their multi-year schemes, Defendants committed at least two related racketeering acts proscribed N.J.S.A. 2C:41-1(a) and 2C:41-2 between 2022 and the present that were otherwise indictable under various provisions of New Jersey  law, thus constituting a pattern of racketeering activity.  These predicate acts include, but are not limited to:

a. *Operation of Illegal Gambling Business/Enterprise.* All Defendants operated, conducted, financed, managed, supervised, directed, or owned an illegal gambling enterprise in violation of N.J. Stat. § 52:17B-139.14 *et seq.*, and numerous other state statutes:

i. The Stake Defendants own and operate the Stake gambling platform, including in New Jersey where it is expressly prohibited by law.

ii. Defendants Drake, Ross, Allen, Nguyen, and others to be identified, upon information and belief, each agreed to promote Stake through advertisements and live streaming their own use of Stake's illegal platform on Kick.

41

b. *Wire Fraud (Misrepresentation of Legality).* From at least 2022 through 2025, all Defendants knowingly (i) devised a scheme and artifice to defraud Plaintiff and other consumers by means of false and fraudulent pretenses regarding the Stake illegal gambling platform; and (ii) used interstate wire communications to facilitate that scheme and artifice in violation of N.J.S.A. 2C:41-1(a) generally, and paragraph (t) in particular by violating the New Jersey Casino Control Act.

    i. Defendant Stake.us (a) holds itself out in its Terms and Conditions, which are available online, as a platform that does "not offer real money gambling" and claims that "no purchase or payment is necessary to participate or play [Stake.us] games"; (b) proclaims that it provides "the ultimate social, safe and free gaming experience" on its homepage; (c) characterizes itself as a "Social Casino," or "an online platform that offers casino-style games for entertainment purposes, without involving real money;" and (d) purports to avoid operations in New Jersey by requesting in its Terms and Conditions that New Jersey residents self-select out of using the services, without sufficiently making this term clear to users like Plaintiff and without actually preventing those in New Jersey from accessing and using Stake.us.

    ii. Defendants Drake, Ross, Allen, Nguyen, and others to be identified, upon information and belief, similarly promoted Stake on their social media platforms and live streams as a safe and legal means of gambling.

    iii. Plaintiff purchased and wagered Gold Coins or Stake Cash, or some combination of both, on the casino games, in reliance on these statements

42

and the illusion they created that gambling on Stake was legal. Plaintiff would not have done so but for Defendants' actions.

c. *Wire Fraud (Streaming Manipulation).* From at least 2022 through 2025, Defendant Drake knowingly devised a scheme and artifice to defraud the Streaming Platforms by obtaining money by means of false and fraudulent pretenses. Upon information and belief, Drake knowingly used interstate wires to further that scheme, including by (but not limited to) (i) agreeing to abide by the terms and conditions of Streaming Platforms prohibiting streaming manipulation; and (ii) transmitting funds to Ross and, upon information and belief, Allen and Nguyen, to procure Bot Accounts to effectuate the streaming manipulation. As a result of these actions, The Streaming Platforms paid Drake millions of dollars that they otherwise would not have paid. Such actions violate N.J.S.A. 2C:41-1(a))

d. *Wire Fraud/Money Laundering.* From at least 2022 through 2025, Defendants Drake, Ross, and, upon information and belief, Allen and Nguyen, conducted financial transactions knowing that those transactions represented the proceeds of their illegal gambling enterprise (a) with the intent to promote the carrying on the streaming manipulation wire fraud; and (b) knowing that the transactions were designed to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the illegal gambling enterprise, in violation of N.J.S.A. 2C:41-1(a).

180.    Continuity and Pattern. These racketeering acts were related and sustained for a period of four or more years. They were not isolated incidents. They pose a threat of, and are, actual systematic, continuous criminal activity on the part of all of the Defendants, who often

43

collected together to engage in these acts.  The Enterprise and activities began no later than 2022 and continued through the present, demonstrating closed-ended and open-ended continuity.

181.    Injury to Business or Property.  Plaintiff has suffered substantial injuries to his property due to Defendants' racketeering activities.

      a.  *Financial Harm.* Plaintiff suffered financial losses for the amount he paid Stake.us for Gold Coins or Stake Cash, as well as the money lost on that gambling.

      b.  *Connection to Enterprise/Pattern of Racketeering.*  The illegal gambling business and the wire frauds Defendants perpetrated to bring business to the illegal gambling business articulated in paragraphs 177-79 proximately caused Plaintiff's damages in an amount to be determined at trial, but expected to be in excess of $5,000,000, plus treble damages, costs, and attorney's fees.

182.    Pursuant to the New Jersey civil RICO statute, Plaintiff and the Class seek treble damages, costs, and reasonable attorneys' fees.

## COUNT II

### RICO Conspiracy, N.J.S.A. 2C:41-2 though N.J.S.A. 2C:41-6
### (Against All Defendants)

183.    Plaintiff realleges the preceding Paragraphs as if alleged herein.

184.    Defendants knowingly agreed and conspired that one or more of them would conduct or participate in the Enterprise's affairs through a pattern of racketeering activity.

185.    Overt acts in furtherance include dissemination of coordinated narratives and the routing and concealment of payments between Defendants via Stake.com "Tipping" and internal transfers, as well as other data and communications contained within Defendants' books and records.

44

186.    Plaintiff and the Class suffered injury by reason of Defendants' **N.J.S.A. 2C:41-2** and seek treble damages, costs, and fees under **N.J.S.A. 2C:41-3**.

## COUNT III

### New Jersey Consumer Fraud Act (CFA), N.J. Stat. § 56:8-1 et seq. (Against All Defendants)

187.    Plaintiff realleges the preceding Paragraphs as if alleged herein.

188.    Defendants engaged in unlawful practices within the meaning of the CFA at N.J. Stat. § 56:8-2 by committing unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentations, and/or concealment, suppression, or omission of material fact with intent to induce reliance, including by (a) misrepresenting the Stake platform as a safe, harmless, and legal platform, when it in fact constitutes an illegal gambling platform; (b) misrepresenting Drake's and Ross's endorsement and promotion of the Stake platform; and (c) concealing from users that, with Stake's acceptance if not active assistance, Drake and Ross use their Stake-derived gains and the Stake platform's Tipping mechanism to fund a streaming fraud scheme in conjunction with Allen, Nguyen, John Does 1-10, and ABC Corporations 1-10.

189.    Defendants also violated N.J. Stat. § 56:8-2.2 in particular, by deceptively marketing and promoting the Stake platform as a safe, harmless, and legal platform, with only valueless Gold Coin token available for users to purchase, when in fact Stake constitutes an illegal gambling platform and the Gold Coin tokens sold to users include Stake Cash which is used for illegal gambling.

190.    Plaintiff suffered ascertainable loss as a result of Defendants' unlawful practices as alleged herein, including by overpayments, loss of the benefit of his bargain, and expending out-of-pocket costs on the Stake service to purchase Gold Coins and Stake Cash, which Plaintiff would not have done if Defendants had not deceived him and users like him as to the truth about the Stake

45

platform and services.  As such, Defendants' deceptive, fraudulent, and unconscionable practices caused Plaintiff to suffer out-of-pocket loss.

191.    Plaintiff seeks statutory damages, actual damages, treble damages where authorized for willful violations, injunctive relief, attorneys' fees, and costs.

## COUNT IV

### Declaratory Judgment – New Jersey Declaratory Judgment Act
### (Against All Defendants)

192.    Plaintiff realleges the preceding Paragraphs as if alleged herein.

193.    An actual and justiciable controversy exists between Plaintiff and the Class, on the one hand, and Defendants, on the other hand, as to Plaintiff's and the Class' rights with respect to challenging Defendants' misconduct via Stake.us, notwithstanding the Stake.us Terms and Conditions that purport to mandate individual arbitration, waiving all class rights, as the exclusive forum for dispute resolution between the parties.

194.    Specifically, section 26 of Stake.us' Terms and Conditions purports to impose on all users, including Plaintiff and the Class, a contract of adhesion, mandating that all disputes be referred to arbitration and that users waive their right to sue in open court.  The Terms and Conditions impose other requirements for Stake's convenience as well, such as purporting to waive any right to challenge the American Arbitration Association's competence, authority, or jurisdiction to hear the matter; requiring that the arbitration be held virtually; limiting depositions to one per party unless Stake consents to more; waiving a hearing if neither party's claims exceed $25,000; and mandating strict confidentiality.

195.    Further, Stake.us' Terms and Conditions require users to waive the right to any form of collective, consolidated, or class action.

46

196. Defendants are expected to argue in this action that the Terms and Conditions require dismissal of any class claims and/or referral to arbitration.

197. Plaintiff contends that the Terms and Conditions are not enforceable to bar his claims, because Plaintiff cannot validly waive his right to bring class-based RICO claims.

198. Plaintiff also contends that the Terms and Conditions, including as to the mandatory arbitration clause and class waiver, are not enforceable to bar his claims, because the Terms and Conditions are contrary to public policy and were procured by fraud.

199. Plaintiff and the Class, and Defendants, are directly adverse to one another on this issue, and the matter is fully ripe for adjudication. The parties' dispute is ongoing and concrete. Indeed, the controversy goes directly to the threshold question of whether the parties' dispute may be heard by this Court, or must instead be relegated to confidential arbitration on Stake's terms.

200. The Court independently possesses jurisdiction over the parties as described *infra*.

201. Granting declaratory relief as requested by Plaintiff will usefully clarify the parties' rights and relieve the current uncertainty as to whether Plaintiff and the Class are entitled to bring claims in court against Defendants, as they have done in this action.

202. Plaintiff and the Class also lack an adequate remedy at law. Absent this Court's declaratory relief, Plaintiff and the Class will remain subject to Stake's claimed right to refer all users' disputes and claims against it to confidential, atomized arbitrations favorable to Stake.

203. As such, good cause exists for the Court to exercise its discretion to grant declaratory relief.

204. Plaintiff seeks a declaratory judgment from this Court affirming and holding that (1) the mandatory arbitration and class waiver terms in Stake.us' Terms and Conditions are unenforceable; (2) enjoining Defendant Stake from conducting business in New Jersey and

47

registering New Jersey residents to use the Stake.us platform; and (3) ordering the cease and desist of the use of bots to drive streams in favor of Defendant Drake.

## COUNT V

### Recovery of Gambling Losses Under, N.J. Stat. § 2A:40-1 et seq.
### (Against Sweepteaks Ltd. d/b/a Stake.us)

205.    Plaintiff realleges the preceding Paragraphs as if alleged herein.

206.    New Jersey Revised Code § 2A:40-1 provides that all wagers, bets, or stakes made to depend upon any race or game, or upon any gaming by lot or chance, or upon any lot, chance, casualty, or unknown or contingent event, shall be unlawful, and that any person who shall pay or deliver any such wager, bet, or stake, or any part thereof, may sue for and recover the money or thing so paid or delivered, or any part thereof, from the winner or person to whom it was paid or delivered.

207.    New Jersey Revised Code §§ 2A:40-5 and 2A:40-6 provide a statutory civil cause of action to recover money paid and lost due to gambling, within six months in which a plaintiff made the payment. If a plaintiff does not institute an action within six months of payment, any other person may sue for and recover the same from the winner, depositary, or stakeholder.

208.    As set forth above, Stake.us operates an illegal online gambling platform that offers nearly 2,000 casino games—including slots, table games, scratch cards, live dealer games, and "Stake Originals"—all of which are games of chance, the outcomes of which are determined by random number generation. Stake.us permits players to place bets using Stake Cash, which can be redeemed for cryptocurrency or digital gift cards at a rate of one Stake Cash to one United States Dollar, and which is bundled with every purchase of Gold Coins.

48

209. The bets, wagers, and stakes placed by Plaintiff and the Class on Stake.us were made to depend upon games of chance, lots, and unknown or contingent events, and were therefore unlawful within the meaning of N.J.S.A. 2A:40-1.

210. Pursuant to §§ 2A:40-5 and 2A:40-6 of the New Jersey Revised Statutes, Plaintiff, on his own behalf and on behalf of the Class, seeks recovery of the total net losses by purchasers of Stake Cash and Gold Coins on Stake.us, within the six months preceding the filing of this complaint.

## PRAYER FOR RELIEF

211. WHEREFORE, Plaintiff, individually and on behalf of the Class, respectfully requests that the Court enter judgment in his favor and against Defendants and award the following relief:

a. Certifying this action as a class action pursuant to New Jersey Rule 4:32; appointing Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel; and directing appropriate notice to the Class;

b. Awarding all available damages, not less than $5,000,000, including statutory, compensatory, consequential, punitive, and enhanced damages and attorneys' fees where authorized by law (including under 18 U.S.C. § 1964(c) and the CFA);

c. Ordering restitution and disgorgement of amounts wrongfully obtained by Defendants;

d. Entering injunctive and declaratory relief to enjoin the ongoing deceit of New Jersey consumers and violation of New Jersey law and prevent further unlawful conduct, including but not limited to a declaratory judgment holding (1) that the mandatory arbitration and class waiver terms in Stake.us' Terms and Conditions

49

are void, illegal, and unenforceable; (2) enjoining Defendant Stake from conducting business in New Jersey and registering New Jersey residents to use the Stake.us platform; and (3) ordering the cease and desist of bots to drive streams in favor of Defendant Drake;

e.  Awarding pre- and post-judgment interest, attorneys' fees, and costs as permitted by law; and

f.  Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Donald M. Lomurro, Esq. is hereby designated as trial counsel for plaintiff and the Class in this matter.

## Rule 4:5-1 CERTIFICATION

I hereby certify that to the best of my knowledge, the matter in controversy is similar to an action that was filed in United States District Court for the Eastern District of Virginia, bearing Docket No. 1:25-cv-2511-LMB-WEF.  I hereby certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

/s/ *Donald M. Lomurro*
Donald M. Lomurro, Esq.
Lomurro Munson, LLC
*Counsel for Plaintiff*

Dated: April 22, 2026

50

IMPRESA LEGAL GROUP

*/s/ George E. Kostel*
George E. Kostel, Esq. (VSB # 34757) (Pro Hac Vice to be filed)
Richard K. Kelsey, Esq. (VSB # 44232) (Pro Hac Vice to be filed)
Impresa Legal Group
3101 Wilson Blvd., Suite 500
Arlington, VA 22201
Tel: (703) 842-0660
Fax : 703-243-8696
Email: georgekostel@impresalegal.com
Email: richkelsey@impresalegal.com